**SUNDQUIST v. CAMDEN FIRE INS. ASS'N.**

No. 7360.

Circuit Court of Appeals, Seventh Circuit.

March 17, 1941.

Rehearing Denied June 11, 1941.

Donald N. Clausen, Herbert W. Hirsh, and Norman A. Miller, all of Chicago, Ill., for appellant.

Harper Andrews and James H. Andrews, both of Kewanee, Ill., and F. B. Brian, of Toulon, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

Plaintiff brought this action on two fire insurance policies, totalling $6,500, issued by defendant. A verdict for $5,500 was rendered, and judgment on the verdict followed.

The policies covered the fixtures and stock of furniture, undertaking and musical goods, owned by Anton Sundquist and located in a building in the village of Galva, Illinois. The store was completely destroyed by fire on December 24, 1936, and plaintiff's loss was by him placed at $20,000. The total insurance carried by all companies was $18,500.

The defenses were arson, fraud in proof of loss (more specifically, forged invoices in support of the proof of loss), and the

non-disclosed existence of a chattel mortgage on part of the property insured. Assured died June 9, 1939, before the trial of this case.

The facts: One policy for $2,500 was issued, May 25, 1936; the other for $4,000, on August 1, 1936. These policies provided, inter alia, for avoidance of liability as follows:

"This policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof, or if the interest of the insured in the property be not truly stated herein, or in case of any fraud or false swearing by the insured, touching any matter relating to this insurance or the subject thereof, whether before or after a loss.

"This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void * * * if the subject of insurance be personal property and be or become encumbered by a chattel mortgage."

On February 13, 1936, assured gave a chattel mortgage to a local bank, which was immediately recorded.

Oral notice of the fire was given immediately, and defendant's representatives investigated. Formal, sworn proofs of loss were given the defendant on February 6, 1937. The proofs showed a loss of $20,-117.42. Defendant asserts it was about $5,000.

The evidence pertaining to the origin of the fire, the value of the property, and the financial status of assured was exhaustive. Two previous trials on other policies were had in the state court, and the verdicts were for plaintiff.

*The Origin of the Fire.* There was a many-sided official and private investigation conducted as to the origin of the fire. Witnesses testified that when the débris was excavated, singed burlap was discovered which smelled strongly of kerosene. This burlap was removed and sealed in tin containers for use at subsequent trials, but it had evidently lost the kerosene odor at the time of the trial. Assured [1] left his store after nine P. M. on Christmas Eve and went to a nearby restaurant where he was notified that some lights "were on" in his store. He went back and turned them off; then went to his other store in the town of Toulon, where he resided, twelve miles distant from Galva. He then went home, where he was notified of the fire some time after eleven P. M.

Witnesses stated there was an explosion about a half hour after the fire started, which blew out the front of the store. Others, some of them apparently disinterested, also stated there had been an odor of gas in assured's store for a few weeks preceding the fire; in fact, a plumber had been called on December 15 or 16 to locate the cause. Old gas mains in the street in front of the assured's store leaked, and the gas company had sent a service man to repair a leak in the adjoining store.

In explanation of the existence of a kerosene smell on the burlap bags, an employee said he swept the store with a compound of sawdust and kerosene, and he kept a small can of kerosene for that purpose. In repairing furniture, kerosene was also used in the glue pots.

*The Valuation of the Property Destroyed.* The loss claimed was $20,000. Included in the proof of loss were pianos, upright and players, victrolas, etc., furniture consisting of bedroom, parlor, and miscellaneous suites, and general furniture store merchandise, also undertaking establishment merchandise. Assured's son testified he assisted his father in making an inventory in May, 1936, which was produced at the trial. There was an attempt to show the inventory was taken in 1932. The value disclosed by the "1936" inventory based on cost, was $20,210.36. There was evidence that the stock was replaced as soon as it was sold, so that the inventory remained practically constant.

The charge of over-valuation in proof of loss is based on the misstated value of pianos in stock. From representatives of three music companies (Shiller, Vose, and Cable) there was evidence that assured purchased pianos, chiefly in 1920, and not later than 1928 (at varying prices, some at $272, some at $391) and not in the period of 1934 to 1936 as defendant charged assured with asserting. The depreciation of new pianos from 1920 to 1935 was such as to make them of little value [2] at the time of the fire. The alleged forgery in relation to these piano values related to invoices allegedly furnished by assured, covering the pianos, which invoices, defendant asserts, were al-

---

[1] His testimony, taken at a trial before his death, was introduced in evidence.

[2] From $10 and not exceeding $100.

tered as to date of purchase, and in other respects. A "handwriting" expert testified to the falsity of the invoices. Evidence of assured's desire to "move up" his dates of purchase appeared in a letter he wrote to Cable Co. on January 7, 1937.

"We had a fire at our store and we had a complete loss. We had one Cable Company player piano which we think was billed to us at about $260 and we also had one Hamilton Straight Piano which we think was billed at about $145 or possibly more. Our adjusters say we have to get duplicate bills on these as our bills were all burned up.

"Wondered if you would help us out by sending us duplicate bills on these two numbers and date them a few years back—about '33 or '34.

"Sincerely,
"Sundquist & Son,
"By A. E. Sundquist."

*The Chattel Mortgage.* The facts as to the chattel mortgage, are:

Defendant disclaims all knowledge of the existence of the mortgage. Plaintiff relies, in refutation, on the evidence of Cree, defendant's "survey" agent who said that he, at his company's request, made an investigation of assured's stock of goods and examined him also as to his financial condition. His testimony as to the mortgage is reproduced:

"And was anything said relative to a chattel mortgage?

"A. Yes, sir.

"Q. What did he say to you about it?

"A. He was telling me about a chattel mortgage he had on some property in Wyoming to cover this debt, or whatever it was, at the bank, and there was some deposits did not cover it and the bank was not satisfied with it, and required additional securities on the store in Galva.

"Q. He had given a chattel mortgage on the store and fixtures there, or the fixtures?

"A. Yes, sir.

"Q. You got that information from him at that time?

"A. Yes, sir.

"Q. That is prior to the issuing of the last policy, * * *.

"A. Shortly after. I investigated before issuing this annual policy on the stock and fixtures in the store at Galva. * * *

"Q. You say you had that conversation with Mr. Sundquist about the chattel mortgage, did you write a letter to the company about it?

"A. The Rockford office. * * *"

Defendant objected to this testimony of its agent.

*Financial Statement.* Assured had been a merchant for forty years before his death. He had two stores, a farm, and a home. His cash sales from May to December, 1936, were $572.18, and credit sales, $809.14.

Judgments had been recovered against him: $3,323.26 on January 22, 1936; $313.22, October, 1937; $1,510.89, February, 1935; and $594.43, February, 1934. He owed from $490 to $495 on his store rent, and the landlord was receiving his rent in merchandise. A local bank had demanded that he pay $1,000 on his $7,000 indebtedness by January 14, 1937.

On the other hand, there was testimony that he had a farm worth $30,000 (subject to a $19,000 encumbrance, which indebtedness had been reduced $7,000 during the year previous to the fire). He had a furniture store in Toulon, valued at about $10,000; also a house and lot of a cash value "from six to seven thousand dollars," and he owned a $2,000 interest in a building.

■ The issue of incendiarism was eliminated by the verdict of the jury. Assuming a jury question was presented (and that is the most defendant could claim for the evidence), the cause was fairly presented to the jury and the verdict is conclusive. Defendant contends, however, that this evidence bore on the wilful falsity of the assured's statement made when he submitted his proof of loss. For this reason we set it forth in the fact statement.

Much more debatable is defendant's argument that its directed verdict motion should have been granted, because the evidence of over-valuation of the property destroyed is conclusive.

■ The law governing this defense may be found in 29 Amer.Jurisprudence, §§ 1133, 1134, 1460, 1541; 7 Couch on Insurance, Sec. 1557; 7 Cooley on Insurance, page 5838; Sundquist v. Hardware Mut. Fire Ins. Co., 296 Ill.App. 510, 16 N.E.2d 771, 776, affirmed 371 Ill. 360, 21 N.E.2d 297, 124 A.L.R. 1375. The court in the last-cited case laid down the Illinois rule as follows:

"* * * False swearing in a proof of loss in order to avoid the insurance policy must be wilful and with intent to deceive and defraud the insurer."

There is no conflict respecting the materiality of the evidence which was offered and received. Plaintiff's argument is that assured did not present the invoice as a part of his proof of loss and that he gave the insurance company's adjusters the names of the piano houses from which he made purchases in order that their prices and values might be ascertained.

It is clear that the age of the pianos materially affected their value. It is also certain that the invoice in question misstated the date when the pianos were purchased. Dispute, however, exists over who is responsible for the appearance of said dates and invoices. Plaintiff employed an adjuster to help him in making out his proof of loss, and he testified as did the adjusters for the insurance company. Each charged the other with responsibility for this evidence. One claimed the evidence was for the purpose of bolstering up an over-valuation of the property destroyed. The other contended that the adjusters for the insurance company were manufacturing a defense, to-wit, the defense of wilful over-statement of loss.

■ Without discussing the evidence in detail, we conclude that the court rightly submitted the case to the jury. Soler & Co. v. United Firemen's Ins. Co., 299 U.S. 45, 57 S.Ct. 54, 81 L.Ed. 30. The extent to which courts go in determining the presence of a jury question is shown by the opinion in Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439. While we need not follow the Cub Fork Coal Co. opinion the entire distance (see opinion in the Court of Appeals, 7 Cir., 59 F.2d 539), in order to affirm the judgment in this case, we believe the language of the court in Soler & Co. v. United Firemen's Ins. Co., supra, is particularly applicable to this case (see 299 U.S. at pages 49, 50, 57 S.Ct. 54, 81 L.Ed. 30).

■ Error is also assigned because the court refused to receive proffered evidence of plaintiff's purchase of a stock of goods in 1922 at a price lower than assured stated it to be. This stock furnished no part of plaintiff's loss as all of said goods had long before been sold. On this theory, the ruling was correct. The court was not "trying" a transaction in no way connected with the loss in question.

The plaintiff met the chattel mortgage issue by asserting a waiver.

The disposition of this defense was in accordance with the Illinois decisions. Firemen's Ins. Co. v. Horton, 170 Ill. 258, 48 N.E. 955; Kronauer & Co. v. Mechanics Ins. Co., 266 Ill.App. 477. See, also, Couch, Cyclopedia of Insurance Law, Sec. 912.

It is apparent from the testimony of the defendant's agent Cree, that he was requested by his company to interrogate the insured respecting the stock of goods and his financial condition. He was informed of the existence of the chattel mortgage, how it happened to be given—namely, to help a brother whose finances had become involved—and the agent communicated that information to defendant's Rockford office.

■ In view of the authority, under which he was acting, it would not have been necessary to communicate the information by him obtained, to the company's main office in order to charge the company with knowledge by him thus obtained. However, in this case the agent did transmit the information he received to his superiors.

■ The only remaining question is the effect of such knowledge on the alleged waiver of this defense. That defendant might waive this defense is clearly established by all the authorities. Couch, Cyclopedia of Insurance Law, Sec. 912. That defendant's action constituted a waiver in Illinois, is established by the decision in Firemen's Ins. Co. v. Horton, 170 Ill. 258, 48 N.E. 955, 956, where it was said:

"Where the insured in a fire insurance company makes statements, to the agent of the company who solicited the insurance, of facts which might, under the terms and conditions of the policy, avoid it if omitted, and the agent does not state such facts, the insured will be as fully protected as though such facts or conditions had been noted in the application or the policy. In other words, notice to an agent of an insurance company of facts which might otherwise avoid the policy will be considered as notice to the company, and as having been waived by the company. * * * It follows, therefore, that the question of fact having been established that Smith was the agent or was acting for the appellant company, and he having been notified of the fact that the chattel mortgage was in existence on a portion of the property insured, appellant could not take advantage of the clause in the policy heretofore referred to, and avoid payment on that account."

It might be stated as additional grounds for a finding of waiver that it does not appear whether the premium on the insurance policy was paid at the time the agent learned of the existence of the chattel mortgage. The agent stated that the premium was paid after the policy was issued. Other testimony discloses that the insured gave the information shortly after the issuance of the second policy. However, it is not necessary, to establish a waiver, that the insurance company be informed, *before* the policy is issued, although that fact would strengthen an insured who was urging a waiver.

The judgment is affirmed.